## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **BARBARA BROWN**, | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 2:08-cv-1318 |
| | ) | **Electronic Filing** |
| **COMMISSIONER OF SOCIAL** | ) | |
| **SECURITY,** | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

## I.   INTRODUCTION

Plaintiff Barbara Brown brought this action pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3) for review of the final determination of the Commissioner of Social Security ("Commissioner") denying her application for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act ("Act"), 42 U.S.C. §§ 401-433, 1381-1383f.  Presently before the court are cross-motions for summary judgment based on the record developed at the administrative level.  After careful consideration of the decision of the Administrative Law Judge ("ALJ"), the briefs of the parties, and the entire record, it is clear that the decision of the Commissioner must be vacated and the case remanded for further proceedings. Accordingly, Plaintiff's motion will be granted insomuch as it requests a remand for further administrative proceedings, Defendant's motion will be denied, and the matter will be remanded with direction to undertake further proceedings not inconsistent with this opinion.

## II.   PROCEDURAL HISTORY

Plaintiff protectively filed for DIB on June 1, 2005 and SSI on June 9, 2005, alleging disability as of June 1, 2002 due to a herniated disc and depression.  (R.  45, 59, 70-71.) Plaintiff's date last insured for purposes of DIB was March 31, 2007.  (R.  78.)  The state agency denied her claims on December 20, 2005.  (R.  52-56.)  At Plaintiff's request a hearing was held before ALJ Alma Deleon on January 28, 2008 where Plaintiff, who was represented by counsel, and a vocational expert testified.  (R.  492-520.)  On February 4, 2008, the ALJ issued a decision

finding Plaintiff not disabled.  (R.  15-20.)  On February 6, 2008, Plaintiff filed an appeal to the Appeals Council, who denied Plaintiff's request for review on August 13, 2008.  (R. 5-8, 9.)  The instant action followed.

## III.   STATEMENT OF THE CASE

Plaintiff was born on October 16, 1963, making her forty years of age at the time of her asserted onset of disability and forty-four years of age on the date of the ALJ's decision.  (R. 492.)  Plaintiff received her GED and completed one year of college.  (R. 148, 492.)  Plaintiff's past relevant work includes serving as site manager for a city doing a lunch program and working as a deli clerk, prep cook, and personal care worker.  (R.  81, 496-499.)

On July 22, 2003, Plaintiff was examined by Dr. Jonathan Urffer for complaints of knee, left hip, and buttock pain with numbness through her leg into her toes.  (R.  113-114.)  She was prescribed Flexeril and Naprosyn.  Id.  Plaintiff underwent an MRI on August 4, 2003, which indicated a small bulge to the left side of L4-5 and a herniated disc at L5-S1 with compression of the S1 nerve root.  (R.  116, 138).  Dr. Thomas Kramer, an orthopaedic surgeon, indicated that Plaintiff should be treated with epidural steroids, physical therapy, and anti-inflammatories.  (R. 138.)  He opined that Plaintiff would need surgical decompression and that procedure, a hemilaminectomy[1] and decompression, was performed on L5 and S1 on September 29, 2004. (R. 138, 123).  At a follow-up on September 30, 2004, Plaintiff reported that her left leg pain had improved.  (R.  120).  Plaintiff's examination was normal and an x-ray revealed that the vertebral bodies were preserved in height and alignment. (R.  122).  Facet hypertrophic changes remained at L4-L5 and L4-S1.  Id.

On October 11, 2004, Dr. Kramer indicated that Plaintiff had "no reoccurrence of her leg pain." (R.  136).  This finding was repeated on November 15, 2004 and a negative straight leg test was noted. (R.  135).  Dr. Kramer examined Plaintiff again on June 20, 2005 for right shoulder pain.  (R.  134.)  A cross-chest maneuver was positive for impingement signs and

---

[1]Removal of a portion of a vertebral lamina and is usually performed for exploration, access to, or decompression of the intraspinal contents. See Stedman's Medical Dictionary, 866 (28th Ed. 2006).

Plaintiff was treated with a cortisone shot to the shoulder.  Id.

On July 19, 2005, Plaintiff completed an activities survey indicating that she could clean house, wash clothes, and cook dinner, but was trying to get her daughter to do those things for her.  (R.  88).  She also indicated that her daughter paid her bills, shopped for her groceries, picked out her clothes, did her hair, tied her shoes, helped her make decisions, and cooked balanced meals. Id. Plaintiff reported that when doing chores she had to rest every fifteen minutes for at least five minutes and that she could walk for a quarter of a mile and lift ten pounds.  (R. 90).  With respect to her emotional symptoms, Plaintiff reported she liked to isolate herself, associating mainly with her children and grandchildren.  (R. 92).  She also indicated that she did not like supervisors or respond well to criticism, had no difficulty understanding instructions or carrying them out, had difficulty with changes in her schedule because they made her anxious, had problems with going overboard when she became angry, and had trouble concentrating at work for extended periods of time.  (R. 92-93).  With respect to her physical symptoms, Plaintiff reported experiencing constant pain in her lower back, left leg, and shoulder and indicated that she did not take her medications as prescribed because she was worried about addiction.  (R. 94-95).  She also indicated that she began using a cane in 2003.  (R. 96).

Plaintiff underwent a physical evaluation by Dr. Ryon Hurh on September 28, 2005. (R. 140-141.)  Dr. Hurh indicated that while Plaintiff reported being depressed, she did not appear depressed and reported no suicidal ideation.  (R. 140).   Physically, Plaintiff was alert, cooperative, and oriented, and her hips, knees, and ankles were within normal limits.  Id. Plaintiff's spine was straight, there was no tenderness in her neck, and she had full range of motion in the shoulders.  (R. 140-141). Plaintiff, however, could only squat half way, had decreased range of motion in her neck, pain with rotation of her right shoulder, reduced strength in her right shoulder, and decreased range of motion in her back.  Id.  Dr. Hurh opined that Plaintiff had a history of diskectomy, degenerative changes to the spine, possible degenerative changes to the right shoulder, and depression.  Id.  Dr. Hurh further indicated that Plaintiff's low back pain was not acute at the time and that her treatment should be conservative.  (R. 141).  Dr. Hurh completed a physical capacities evaluation indicating that Plaintiff could lift ten pounds

3

frequently and twenty pounds occasionally; could carry two to three pounds frequently and ten pounds occasionally; could stand and/or walk four hours per day; could sit eight hours a day with a sit/stand option; had the limited ability to push and pull in her upper and lower extremities; could occasionally bend, stoop, kneel, balance, and climb; could never crouch; was limited in reaching due to right shoulder pain; and had problems with temperature extremes. (R. 144).

On October 14, 2005, Dr. Anthony Fallica, Ph.D., performed a psychological evaluation of Plaintiff. (R. 147-153). During the evaluation, Plaintiff indicated that she had Hepatitis C, was on probation for welfare fraud, and did not want to admit to why she had been fired from her last job. (R. 148-150). Plaintiff reported suffering from visual hallucinations; unusual gustatory and tactile experiences; and substance abuse which included the use of alcohol, cocaine, and marijuana. (R. 150-151). Upon examination, Dr. Fallica noted that Plaintiff was alert and oriented times three; had a good fund of knowledge; had unimpaired social judgment; and mildly impaired common sense and adequate planning. (R. 152). Dr. Fallica opined that Plaintiff was suffering from an alcohol and cocaine induced mood disorder[2] with depressive features associated with cannabis use which was complicated by borderline personality disorder[3]. He also indicated that a single episode of major depressive disorder should be ruled out. Id. Dr. Fallica completed a medical sources statement indicating that Plaintiff had slight impairment in making judgment on simple work related decisions; moderate limitations in understanding and remembering simple directions and carrying out detailed instructions; and slight limitations in interacting appropriately with supervisors and co-workers, in responding appropriately to work

---

[2] Essential features of a substance induced mood disorder include a prominent and persistent disturbance of mood judged to be due to the direct physiological effects of a substance. See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 370 (4th ed. 2000).

[3]Personality disorder is an enduring pattern of inner experience and behavior that deviates markedly from the expectations of the individual's culture, is pervasive and inflexible, has an onset in adolescence or early childhood, and leads to distress or impairment. See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 629 (4th ed. 2000).

pressures in the usual work setting and to changes in a routine work setting.  (R.  155).  Dr. Fallica stated "the claimant's reported use of alcohol (beer & liquor) plus other substances (e.g. marijuana and cocaine) is more than likely to cause some difficulties in her life.  For example, her use of alcohol and cocaine will contribute to her unstable moods.  Her use of marijuana will probably exacerbate her anxiety...[i]f she abstains from all substances, it is likely that her mood will be stabilized, i.e. will experience a decrease of depression, anxiety, & anger."  (R.  156).

On November 30, 2005, Dr. Alfred Mancini, MD, completed a physical residual functional capacity evaluation based on Plaintiff's records.  (R.  158-162).  Dr. Mancini indicated that Plaintiff could occasionally lift ten pounds, frequently lift less than ten pounds, stand and walk for at least two hours and sit for six hours in an eight hour work day, was limited in her ability to push and pull with her upper extremities, and could occasionally climb, balance, stoop, kneel, crouch, and crawl.  Id.

Dr. Roger Glover, Ph.D., completed a Psychiatric Review Technique form and Mental Residual Functional Capacity Assessment on December 9, 2005.  (R.  165-179).  After reviewing Plaintiff's records, Dr. Glover indicated that Plaintiff suffered from substance induced mood disorder, and personality disorder, NOS.  (R.  172, 176).  Dr. Glover indicated that Plaintiff was moderately limited in the ability to understand and remember detailed instructions; moderately limited in the ability to carry out detailed instructions and in the ability to maintain attention and concentration for extended periods; moderately limited in the ability to interact appropriately with the general public; and moderately limited in the ability to respond appropriately to changes in the normal work setting and in the ability to set realistic goals or make plans independently of others.  (R.  165-166).  Dr. Glover further opined that Plaintiff had mild restrictions in the activities of daily living and in maintaining social functioning, moderate difficulties in maintaining concentration, persistence, and pace, and no episodes of decompensation.  (R.  179).  In summation, Dr. Glover stated that Plaintiff was "able to meet the basic mental demands of competitive work on a sustained basis despite the limitations resulting from her impairment."  (R.  176).

On February 2, 2006, Plaintiff was seen by her primary care physician, Dr. Jalit Tuchinda,

M.D. when blood tests indicated that she tested positive for Hepatitis C. (R. 188-189). Plaintiff reported feeling good and her physical examination was normal. (R. 189). Plaintiff was seen again on September 6, 2006 complaining of muscle pain in the neck, fatigue, and a rash. She was prescribed Keflex for her rash and was told to try Advil and applying heat for her neck. (R. 184). On April 30, 2007, Plaintiff presented with a tearful, flat affect. She complained of difficulty sleeping, worrying, fatigue, and trouble keeping up with responsibilities. Dr. Tuchinda prescribed Celexa. (R. 183.)

On May 16, 2007, Plaintiff underwent a clinical intake assessment from a licensed clinical social worker at Mercy Hospital for a partial outpatient hospitalization program to treat her substance abuse problems. (R. 208-225). Plaintiff reported that she was drinking daily at a rate of at least two cases per week, was smoking crack/cocaine daily, and was smoking marijuana one or two times per month. (R. 208-209). The social worker indicated that Plaintiff had a Global Assessment of Functioning ("GAF") of 45.[4] (R. 215). On the same date, another social worker assessed her with a GAF of 50. (R. 247). Upon examination, the intake social worker indicated that Plaintiff exhibited blunted affect at times, reduced eye contact, grimacing gesturing, and psychomotor agitation. (R. 211). She further reported that Plaintiff was tearful at times when talking about trauma, smiling at times when in emotional pain, had a labile or

---

[4] The Global Assessment of Functioning Scale ("GAF") assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. A GAF score of between 31-40 denotes severe impairment. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 51-60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 41-50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood"; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .;  of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." Id.

happy/euthymic mood depending on the content of her answers, was anxious, nervous, and worried, had impaired concentration, and reported frequent suicidal ideation. (R. 211-212). Records indicate that despite participating in the intake assessment, Plaintiff did not begin the substance abuse program in May.

On July 25, 2007, Plaintiff underwent a second clinical intake assessment at Mercy Hospital. (R. 192-207). Plaintiff reported that she would drink to intoxication a couple of times a month, would use cocaine a couple of times and marijuana a couple of times a month. (R. 192). Upon examination, the social worker found that Plaintiff was tearful at times; had reduced eye contact and psychomotor agitation; had an alternating mood between being happy/euthymic and sad/dysthymic; was anxious, nervous, and worried; had blunted affect at times; had impaired concentration and ability to focus; had adequate insight and good judgment; was experiencing short term memory impairment; and suicidality with infrequent ideation. (R. 195-196). Plaintiff reported paranoid and persecutory thought content and increased isolation. (R. 195, 199). The social worker assessed Plaintiff with a GAF of 30. Plaintiff's proposed treatment plan included group and individual sessions five days a week for several months. (R. 239).

Plaintiff attended her first group treatment session on July 26, 2007. (R. 324-25, 427-30, 433). Staff members reported that she had an appropriate mood and affect. (R. 325). On the following day, Plaintiff attended group sessions and underwent a psychiatric evaluation by Dr. Raymond Pan, M.D. (R. 229-231). Plaintiff reported that she had been participating in behaviors that she had never done before like saying things that she did not mean and shoplifting. (R. 229). Plaintiff also reported that her mood was irritable and that she had difficulty falling and staying asleep, decreased appetite, increased energy, racing thoughts, mood swings, auditory and visual hallucinations, a long history of drug abuse, paranoid thoughts, and feelings that people were watching her. (R. 230). Upon examination, Dr. Pan indicated that Plaintiff's affect was blunted, her thoughts were goal directed and coherent, she had no looseness of associations or mood swings, and denied suicidal or homicidal ideation. Id. He reported that Plaintiff had fair attention and concentration and poor insight and judgment. Id. Plaintiff was diagnosed with

7

mood disorder, NOS[5]; post traumatic stress disorder[6], and alcohol and cocaine dependence in early remission. Dr. Pan assessed her with a GAF of 40 and started her on 10 milligrams of Abilify daily.  (R.  228, 230-231).

On July 30, 2007, Plaintiff attended group treatment sessions where she reported that she had the desire to use drugs and alcohol but was remaining abstinent. The staff indicated that Plaintiff was able to set limits with a peer who was trying to engage her in a side conversation. (R.  320-321.)  Plaintiff did not attend her next two therapy sessions on July 31 and August 1, 2007.  (R. 318-319).  On August 2, 2007, Dr. Pan increased Plaintiff's prescription for Abilify to 15 mg daily due to reports from Plaintiff that she was still experiencing mood swings, irritability, and hallucinations.  (R.  227, 234, 417-419).  Plaintiff also attended group treatment sessions and was attentive during those sessions.  (R.  316-317, 431-432).  Plaintiff did not attend her sessions on August 3, 2007, and only attended sessions on one occasion during the week of August 6 - 10, 2007.  (R.  310-315, 413-16).  Plaintiff attended one session of group treatment during the week of August 13- 17, 2007.  (R.  305-308, 412).  For the remainder of August, Plaintiff attended two days of group treatment on August 28 and 29, 2007.  (R.  296-298, 407-411).  At the August 29th session, staff reported that Plaintiff was anxious about having to move and that she appeared very anxious, had a flat affect and seemed preoccupied.  (R.  296-297).  During her individual therapy session on the same date, Plaintiff was tearful.  (R.  296).

Plaintiff attended no group or individual sessions during the first three weeks of September 2007.  (R.  287-295).  When reached by telephone on September 20, 2007, Plaintiff indicated that she was still interested in attending and would attend the next week.  (R.  287).  On September 25, 2007, Plaintiff admitted to the therapist over the phone that she had been using.

---

[5] A disorder with mood symptoms that does not meet the criteria for any specific mood disorder. See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 375 (4th ed. 2000).

[6] Development of characteristic symptoms following exposure to an extreme traumatic stressor involving direct personal experience of a traumatic event. See American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 425 (4th ed. 2000).

(R. 368). She attended group therapy on September 26, 2007 and September 27, 2007, at which time Plaintiff reported isolating herself and being obsessed with death. Plaintiff denied suicidal ideation but indicated she viewed death as an escape. (R. 283-286, 401-406). Dr. Pan increased Plaintiff's Abilify to 20 milligrams daily. (R. 226, 232). Plaintiff did not attend treatment on September 28, 2007. (R. 281). On October 1, 2007, Plaintiff underwent a health and safety assessment during individual therapy. (R. 277, 398-400, 466, 466, 467). Staff members indicated that Plaintiff reported her symptoms of appetite loss and suicidal attempts as "minimal;" her symptoms of sleep disturbance as "mild;" and her symptoms of suicidal plan, auditory and command hallucinations, paranoia and suspiciousness, and pain as "moderate".(R. 466). No severe symptoms were indicated. Id. Plaintiff was assessed with a GAF of 40. (R. 467).

Plaintiff did not attend her therapy sessions on October 3 and 4, 2007, but did attend on October 5, 2007. (R. 273-276, 394-396). On October 5, 2007, Plaintiff also underwent a psychological assessment by Dr. Charles Cohen, Ph.D. (R. 251-255). At the examination, Plaintiff reported that she had been fired from her last job for verbally assaulting another employee. (R. 253). Dr. Cohen noted Plaintiff had good eye contact and no abnormalities of behavior or psychomotor activities, but reported depression with bouts of anger. Id. Upon mental examination, Dr. Cohen indicated Plaintiff's affect was mildly restricted; her mood, at times, appeared mildly depressed; her thought productivity was normal, goal-directed and coherent; her general fund of information was poor; and she was not agitated. (R. 254). He further reported that she was oriented times three with intact memory and had fair judgment. (R. 253). Dr. Cohen tested Plaintiff with a Minnesota Multiphasic Personality Inventory II Test or MMPI-II test[7], which resulted in an invalid profile and an off-the-scale F-Scale[8] test result. (R.

---

[7]A questionnaire type of psychological test for ages sixteen and older, with five hundred and fifty true/false statements coded in four validity and ten personality scales. See Stedman's Medical Dictionary, 1957 (28th Ed. 2006).

[8]The F-Scale or F(b) scale is a validity scale associated with the MMPI-II test and

(continued...)

254).  Dr. Cohen reported the test results indicated a "high likelihood that she was grossly exaggerating her symptoms."  Id.  He diagnosed Plaintiff with mixed substance dependency; rule out bipolar disorder with psychotic features; rule out mood disorder, NOS, secondary to substance abuse, mixed personality disorder with avoidant and paranoid features, and rule out malingering.  Id.  Dr. Cohen indicated his prognosis was guarded and stated, "[m]y impression is that if motivated and if able to stay off substances, she would be capable of coming to work on time, of dealing reasonably well with authority figures and peers and would be able to concentrate well enough to perform simple, repetitive tasks."  Id.

Dr. Cohen also completed a mental capacities evaluation indicating that Plaintiff had moderate limitations in understanding and remembering short, simple instructions and in carrying out those instructions; had marked limitations in the ability to understand and remember detailed instructions and carry out those instructions; had moderate limitations in making judgments on simple work-related decisions; had marked restrictions in interacting appropriately with the public; and had moderate restrictions in interacting appropriately with co-workers and supervisors, responding appropriately to work pressures in a usual work setting, and responding appropriately to changes in a usual work setting.  (R. 256).

During the week of October 8-12, 2007, Plaintiff attended two days of treatment sessions.  (R. 266-272, 392-393, 461-463).  At one session, she indicated that her birthday was approaching and that she usually used drugs on her birthday. She reported "making reservations" to use again this year but was being encouraged by family to refrain.  (R. 267).  A psychiatric progress note from the same date indicated she continued to report mood swings and was sleeping five to six hours per day.  (R. 472).  Plaintiff attended three days of sessions during the week of October 15-19, 2007.  (R. 259-265, 453-460).  She reported that she was "more likely to express her anger without yelling and screaming like she had done in the past."  (R. 265).  She further reported that she had gotten through her birthday without using drugs.  (R. 262).  Plaintiff

[8](...continued)
designed to assess a pattern of randomness or carelessness to items appearing at the end of the test.  See Bernardo J. Carducci, Psychology of Personality, 52 (2d Ed. 2009).

missed all treatment sessions during the week of October 22-26, 2007.  (R.  258, 361-364).

Plaintiff attended four treatment sessions during the week of October 29-November 2, 2007.  (R.  352-360, 441-452, 471).  On October 30, 2007, staff reported that Plaintiff had a brighter affect and was more animated and spontaneous, but in individual therapy she continued to report racing thoughts, irritability, and passive suicidal ideation.  (R.  357-58, 448-450).  At a session on November 2, 2007, Plaintiff reported that she was not taking her medications as prescribed due to sedation, and consequently her Abilify was decreased and she was started on Trazadone.  (R.  471).  Plaintiff missed all treatment sessions for the weeks of November 5-9, 2007 and November 12-16, 2007.  (R.  341-350).

Plaintiff attended two days of treatment during the week of November 19-23, 2007.  (R. 312).  On November 20, 2007, staff reported that she interacted well with her peers. (R. 340). Plaintiff missed all sessions during the weeks of November 26-30, 2007 and December 3-7, 2007.  (R.  327-337).  On December 5, 2007, a message was left on Plaintiff's phone indicating that her case would be closed if she did not contact her treatment program.  (R.  330).  Plaintiff telephoned to cancel on December 7, 2007 stating that she was having difficulties with transportation.  (R.  328).  Plaintiff missed all therapy sessions during the week of December 10-14, 2007.  (R.  326-327, 365, 389-390).  Plaintiff called on two days to state that she was having difficulty with transportation.  (R.  326-327).  On December 13, 2007, Plaintiff was contacted by telephone and reported having difficulty getting out of bed and was feeling more depressed. She was told that she needed to come in for treatment.  (R.  389).

During the week of December 17-21, 2007, Plaintiff attended two treatment sessions.  (R. 382-387, 479-484).  Plaintiff indicated she was experiencing feelings of inadequacy and at one session staff indicated she had a depressed mood and blunted affect.  (R.  383, 387).  Plaintiff did not attend any treatment sessions during the weeks of December 24-28, 2007 and December 31, 2007- January 4, 2008. (R.  374-381).  On January 7, 2008, Plaintiff attended a group therapy session and stated she was "a little depressed."  (R.  372).  At her individual therapy, Plaintiff's therapist discussed her noncompliance with the partial hospitalization treatment course and possible alternative treatment options including transition to a step group.  (R.  372-373).

Plaintiff reported that she was engaging in self-destructive behaviors including promiscuity so that she could exercise power over men.  Id.  She discussed feeling guilt and anger towards herself and was tearful when discussing her problems.  Id.  On January 8, 2008, Plaintiff told her group she was leaving the partial hospitalization program because she was getting better and was "graduating."  (R.  370, 473-475).

At the hearing on January 28, 2008, Plaintiff testified that she is unable to work because "I don't have the ability to concentrate and my lack of interest in anything is very short.  And physically it's just not possible for me."  (R.  493).  As to her physical ailments, Plaintiff indicated she had arthritis in her hip, a damaged nerve in her back, and arthritis in her shoulder. Id.  These ailments caused pain in her left hip down her left leg, pain in both shoulders, and pain in her hip and back.  (R.  506-507).  With respect to her mental ailments, Plaintiff indicated she heard voices and suffered from sleepiness.  (R.  493).  She noted that these ailments caused angry outbursts, a need for isolation, problems with concentration, a need to sleep during the day, and feelings of guilty, worthlessness, and  lack of energy.  (R.  527-528).  She stated that her need for isolation caused her absences from the partial hospitalization program.  (R.  514).  Plaintiff testified that she took no pain medication due to concerns of addiction, but was on Abilify and Trazadone, which caused drowsiness.  (R.  496-497).  Plaintiff admitted to her problems with crack/cocaine and alcohol and stated she had been clean since July 24, 2007 with one relapse on cocaine.  (R.  494-495.)

As to her previous work, Plaintiff testified she was last employed as a deli clerk and was fired for stealing.  (R.  496).  She also stated she was fired from two positions as a prep cook for stealing.  (R.  499).  Her other positions included a seasonal site manager job with the city doing a lunch program and work in personal care for the elderly, a job from which she was fired for sleeping while at work.  (R.  498-499).  Plaintiff testified that she was capable of washing dishes and clothes every few days; cooking; sometimes making the bed; reading; watching TV; sometimes taking out the trash, carrying light grocery bags, bathing and dressing herself; and sometimes walking twelve blocks for about an hour to the store.  (R.  500-503).  Plaintiff testified that she could not do yard work, stand for long periods because it bothered her, reach

12

overhead, or walk to Narcotics Anonymous meetings because her house was located on a hill which she would have to walk up and down. (R. 510). Plaintiff indicated she was capable of standing for fifteen to twenty minutes and sitting for thirty to forty minutes. (R. 504).

The ALJ concluded that Plaintiff had not been under a disability as defined in the Act from January 1, 2002, through the date of the decision. (R. 20). She determined that Plaintiff had the following "severe" impairments: degenerative disc disease, depression, and shoulder impingement syndrome. (R. 15). She also determined that Plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1. (R. 15-16). She further found Plaintiff had the residual functional capacity to engage in light work, (lifting and carrying no more than twenty pounds), that required no more than minimal contact with co-workers and supervisors and did not require her to reach overhead, push or pull with her upper or lower extremities, deal with the public, cope with stress management in an emergency situation, adapt to frequent changes in the workplace, make complex decisions, or follow detailed instructions. (R. 16-18).

In support of her determination that Plaintiff did not meet a Listing, the ALJ stated that "[t]he record shows that claimant experiences mild pain and limitation at best and appears to function quite well." (R. 15). The ALJ relied on the treatment records of Dr. Kramer and Dr. Urffer as well as the consultative examination performed by Dr. Rorh to discount the severity at a listing level for Plaintiff's degenerative disc disease and impingement syndrome. (R. 15-16). She used evidence of Plaintiff's daily activities and the consultative examination of Dr. Fallica to support her conclusions with respect to Plaintiff's mental impairments. (R. 16). She also noted Plaintiff's mental health treatment did not begin until 2007, that she was not markedly limited in her ability to tolerate stress, she had never been psychiatrically hospitalized, and she took "no significant psychotropic medication prescribed by a psychologist." Id.

In support of her conclusion that Plaintiff could perform modified light work, the ALJ considered the records of Dr. Urffer, Dr. Kramer, and the consultative examination and physical capacities evaluation of Dr. Hurh. (R. 17-18). The ALJ also gave weight to the opinions of Dr. Fallica and Dr. Cohen, who performed consultative mental examinations of Plaintiff. (R. 18).

She further relied on some of Plaintiff's Mercy Behavioral Health records stating "[d]uring this time the claimant reported crying spells, paranoia, irritability, and racing thoughts.  The claimant also noted that she was unable to hold a job because she would continually call off to use drugs. Treatment notes indicated that claimant was diagnosed with depression, a mood disorder, and post traumatic stress disorder."  (R.  18).

## IV.   STANDARDS OF REVIEW

The Commissioner's findings and conclusions leading to a determination that a claimant is not "disabled" must be supported by substantial evidence.  Richardson v. Perales, 402 U.S. 389, 401 (1971); Stunkard v. Secretary of Health and Human Services, 841 F.2d 57, 59 (3d Cir. 1988).  The task of this court in reviewing the decision below is "to determine whether there is substantial evidence on the record to support the ALJ's decision."  Burnett v. Commissioner of Social Security, 220 F.3d 112, 118 (3d Cir. 2000).  Substantial evidence "means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Morales v. Aphel, 225 F.3d 310, 316 (3d Cir. 2000)(quoting Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999)).

As the fact finder, the administrative law judge ("ALJ") has an obligation to weigh all the facts and evidence of record and may accept or reject any evidence if the ALJ explains the reasons for doing so.  Plummer, 186 F.3d at 429.  This includes crediting or discounting a claimant's complaints of pain and/or subjective description of the limitations caused by his or her impairments.  Van Horn v. Schweiker, 717 F.2d 871, 873 (3d Cir. 1983); Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999).  And where the findings of fact leading to the decision of the Commissioner are supported by substantial evidence, a reviewing court is bound by those findings, even if it would have decided the inquiry differently.  Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2000).  But where a review of the entire record reveals that the Commissioner's decision is not supported by substantial evidence, the court has an obligation to reverse the decision and remand with direction to grant benefits or conduct further proceedings. Podedworny v. Harris, 745 F.2d 210, 221 (3d Cir. 1984).  A remand with direction to grant benefits is appropriate only when substantial evidence on the record as a whole indicates the

claimant is disabled and entitled to benefits.  Id. at 221-22.

## IV.    DISCUSSION

Plaintiff argues that the ALJ's Residual Functional Capacity (RFC) determination that Plaintiff was to avoid stress management in "emergency" situations, "frequent" changes in the workplace, "complex" decisions and "detailed" instructions was not supported by substantial evidence because the ALJ failed to consider relevant evidence and gave undue weight to other evidence. In support of this argument Plaintiff contends that: 1) the ALJ only afforded three sentences of her opinion to Plaintiff's Mercy Behavior Health treatment records and failed entirely to consider the GAF scores assigned by Dr. Pan, Plaintiff's treating psychologist; 2) the ALJ misstated that Plaintiff took no psychotropic medications prescribed by a psychologist and would continually call off from work to use drugs; 3) the ALJ ignored many of Plaintiff's reported symptoms and other evidence indicating she was suffering from significant stress; and 4) the ALJ erred in relying on mental examinations and evaluations from before Plaintiff began her substance abuse treatment.[9]  Defendant posits that the ALJ's determination was supported by substantial evidence.

"'Residual functional capacity'[RFC] is defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'"  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999)).  A claimant's RFC represents the most, not the least, that a person can do despite his or her limitations.  See Cooper v. Barnhart, 2008 WL 2433194, at *2 n.4 (E.D.Pa., June 12, 2008) (citing 20 C.F.R. § 416.945(a)).  In determining a person's RFC, an administrative law judge must consider all the evidence of record. 20 C.F.R. §§ 404.1520, 416.920.  Although an administrative law judge can weigh the credibility of the evidence when making a RFC determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so.  Id.  As the court stated in Burnett, "'[i]n the absence of such an

---

[9] It is noted that Plaintiff only challenges the ALJ's RFC assessment with respect to her mental impairments.

indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'"   Id. at 121 (quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

The failure to consider the Dr. Pan's treatment records including the GAF scores, mental status examination, and notes on Plaintiff's treatment with psychotropic drugs was done in error . Dr. Pan was Plaintiff's treating psychologist who co-managed her nine month treatment and prescribed her medications.  "A cardinal principle guiding disability eligibility determinations is that the ALJ accord treating physicians' reports great weight, especially 'when their opinions reflect expert judgment based on a continuing observation of the patient's condition over a prolonged period of time.'"  Morales v. Apfel, 225 F.3d 310, 317 (3d Cir. 2000) (quoting Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999)); see also Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989); Podedworney v. Harris, 745 F.2d 210, 217-18 (3d Cir. 1984).  Therefore, a treating physician's opinion is accorded controlling weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with other substantial evidence in [the claimant's] record." Fargnoli v. Massarani, 247 F.3d 34, 42 (3d Cir. 2001).

With respect to Plaintiff's Mercy Behavioral Health records, the ALJ included only the following:

> Exhibit 10F and 11F detail the claimant's group therapy at Mercy Behavioral Health.  During this time the claimant reported crying spells, paranoia, irritability, and racing thoughts.  The claimant also noted that she was unable to hold a job because she would continually call off to use drugs.  Treatment notes indicate the claimant was diagnosed with depression, a mood disorder and post traumatic stress disorder.

(R. 18).[10]  Dr. Pan assessed Plaintiff with a GAF of 40 during his psychological assessment in Plaintiff's first days of treatment.  This score of 40 was repeated by Plaintiff's therapist and Dr.

---

[10]After a thorough review of the record, this Court could find no reference to Plaintiff suggesting she missed work for drug use. Plaintiff reported that she was fired from her previous jobs for sleeping during work hours and for stealing, but made no suggestion that she was missing work due to drug use.

Pan as part of a review of Plaintiff's treatment in October.[11]  While there is no direct correlation between a claimant's GAF and the level of severity that an impairment must reach in order to render the claimant disabled under the Act, a GAF score, like any other medical evidence, must be considered by the ALJ.  Colon v. Barnhart, 424 F.Supp.2d 805, 812 (E.D.Pa. 2006). It is an objective diagnostic measure used by those in the mental health field to signify a certain level of functioning.

As previously emphasized, a GAF of 40 is indicative of "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood" and was evidence of serious symptoms relating to Plaintiff's mental impairment. Dr. Pan's psychological assessment records tend to show that Plaintiff was reporting serious symptoms.  While Dr. Pan gave no direct opinion on Plaintiff's ability to work or ability to cope with work related activities, his medical evidence should have been noted and assessed.  Of course, the ALJ is free to reject medical evidence when it is contradicted by other medical evidence.  Jones v. Sullivan, 954 F.2d 125, 129 (3d Cir. 1999). But an ALJ is not free to employ his own expertise against that of an examining physician who has presented competent medical evidence.  Plummer v. Apfel, 186 F.3d 422, 429 (3d Cir. 1999). And this principle is particularly forceful in the area of mental impairments where clinical and examining sources are based on an additional level of expertise.  Morales, 225 F.3d at 317-318,

---

[11]Three other GAF assessments were made during intake evaluations at Mercy by three separate social workers. During the first intake assessment two social workers assessed Plaintiff with a GAF of 45 and 50. At the second intake assessment, a social worker assessed Plaintiff with a GAF of 30. The social workers only spoke to Plaintiff on one occasion and were not "acceptable medical sources" within the meaning of the Act. See SSR 06-03p. The Social Security regulations provide that evidence from an acceptable medical source is necessary to determine whether a claimant is disabled. See 20 C.F.R. § 404.1513(a)(1)-(3). However, the Social Security regulations provide that information from non-medical sources is also acceptable information to supplement information from medical sources. See 20 C.F.R. § 404.1513(e). The regulations provide that other valid sources include (1) public and private social welfare agencies; (2) observations by non-medical sources; and (3) other practitioners like naturopaths, chiropractors, audiologists. See § 404.1513(e)(1)-(3). Therefore, on remand, the ALJ should note these scores and determine the appropriate weight to given to them.

19 ("the principle that an ALJ should not substitute his lay opinion for the medical opinion of experts is especially profound in a case involving a mental disability.").

The ALJ also misstated Plaintiff's treatment history with psychotropic drugs.[12] In her opinion, the ALJ suggested that Plaintiff took no significant psychotropic medications prescribed by a psychologist.  Dr. Pan prescribed Abilify and Trazadone, both psychotropic drugs, to Plaintiff during her treatment at Mercy and increased her dosages when she reported continuing symptoms.  This was clearly evidence from a treating physician relevant to Plaintiff's impairments that should have been discussed, rather than misstated. The ALJ summarized the remainder of Plaintiff's Mercy treatment records in three sentences failing to even mention Dr. Pan's treatment records except to state his diagnoses.  Since the ALJ did not appropriately address Dr. Pan's scores or records, this case requires remand for a reassessment of Plaintiff's residual functional capacity that includes a discussion of Plaintiff's treatment by Dr. Pan.

As a second part to her argument, Plaintiff contends that the ALJ relied on Dr. Fallica's examination and functional capacity evaluation and Dr. Glover's functional capacity evaluation performed in October and December 2005 in error.[13]  Plaintiff suggests that these evaluations were not probative because neither mental health practitioner had the benefit of reviewing subsequent treatment records from Mercy Behavioral Health which she essentially argues "proved incorrect" the earlier determinations.  Two issues arise with Plaintiff's arguments as to Dr. Fallica's report: 1) the evidence is relevant to Plaintiff's claimed period of disability and 2) Plaintiff's recent treatment history does not dispositively prove Dr. Fallica's report "incorrect." Plaintiff cites to Brownawell v. Commissioner of Social Security, 554 F.3d 352, 358 (3d Cir. 2008), suggesting that it supports her propositions that Dr. Fallica and Dr. Glover's reports were not probative.   In Brownawell, the Court of Appeals found that the ALJ had erred in accepting the opinion of a consulting physician over that of Plaintiff's treating physician stating that "[the

---

[12] The term psychotropic is applied to drugs that affect the mental state. See Dorland's Illustrated Medical Dictionary, 1384 (31st Ed. 2007).

[13] This Court notes that Dr. Glover's report was based mainly on the examination by Dr. Fallica as Plaintiff had received no other mental health treatment at that point.

consulting examiner's] opinion should have been given minimal weight as it suffers from logical errors and is not based on a personal examination."  Id. at 358.

In contrast, Dr. Fallica's report was based on a personal examination that was made during the period in which Plaintiff claims she was disabled.  See Berry v. Astrue, 2009 WL 506811, *14 (W.D.Wash. 2009)(holding that the validity of an earlier assessment was not compromised when that assessment was performed well within the period of disability alleged by Plaintiff).  Plaintiff does not dispute that the record reveals a history of drug and alcohol addiction, but suggests that she began a permanently clean lifestyle following her "clean date" of July 24, 2007, which would render her drug and alcohol use immaterial because her mental impairments continued after that date.  Despite these contentions, the remainder of the record fails to Dr. Fallica's diagnoses or opinions as Plaintiff continued to use drugs and alcohol through July 2007, with a relapse in September 2007.[14]  Neither Dr. Pan nor any treating mental health practitioners at Mercy Behavior Health stated that Plaintiff's ailments had no ties to her substance abuse.  Therefore, it would be inappropriate for this Court to find that Dr. Fallica's report was not probative and should have been totally disregarded because it opined that Plaintiff's mental impairments were affected by her substance abuse.[15]

---

[14] Materiality of drug and alcohol abuse to a plaintiff's disability determined by whether a Plaintiff would be disabled in the absence of his or her drug and alcohol abuse. Once the individual is found to be disabled, the relevance of his or her drug or alcohol addiction to her disability is determined. The key inquiry in the determination of whether substance abuse is a "contributing factor material to the determination of disability" is whether the plaintiff "would still [be]...disabled if [she] stopped using...[drugs]."20 C.F.R. §404.1535.  The ALJ made no specific materiality determination relating to the affect of Plaintiff's substance abuse on her mental impairments. Plaintiff argues that any drug or alcohol usage should not be "material" because the ALJ failed to consider it as a severe impairment. The Court notes, however, that despite the ALJ's failure to treat Plaintiff's drug addictions as severe, she consistently used evidence of drug addiction and its effects on Plaintiff's impairments throughout the opinion. It is evident, therefore, that on remand, the weight given to this particular medical evidence will require further explanation.

[15] It is noted that Dr. Fallica was the only mental health practitioner to examine Plaintiff before her treatment at Mercy Behavior Health starting in July 2007. Therefore, this evidence

(continued...)

Plaintiff makes an alternative argument as to Dr. Glover's report suggesting that it was a check-the-box form that was devoid of supporting reasons for his assessment.  "Form reports in a which a physician's obligation is only to check a box or fill in a blank are weak evidence at best....where these so-called reports are unaccompanied by thorough written reports, their reliability is suspect."  Mason v. Shalala, 994 F.2d 1058, 1065 (3d Cir. 1993). As was noted above, Dr. Glover's residual functional capacity evaluation was based solely on Dr. Fallica's examination and report. He relied on Dr. Fallica's reasoning without records, an examination or reasoning of his own.  Accordingly, the significant weight given to this report by the ALJ was inappropriate.

Since the ALJ clearly omitted discussion on pertinent medical evidence from Plaintiff's treating psychologist and failed to explain her acceptance and rejection of other medical evidence in her discussion of Plaintiff's residual functional capacity, the administrative decision under review is not "supported by substantial evidence."  A remand for further administrative proceedings is required.  On remand, the Commissioner must adequately explain the weight given to the opinions and evidence from all treating, examining, and non-examining physicians. Accordingly, the Court will vacate the Commissioner's determination that Plaintiff is not entitled to SSI and DIB benefits under the Act, and remand this case for further administrative proceedings consistent with this opinion.

An appropriate order will follow.


Date: November 25, 2009


                                        s/ David Stewart Cercone
                                        David Stewart Cercone
                                        United States District Judge

---

[15](...continued)
would be especially probative to Plaintiff's claim for DIB as her date last insured was March 31, 2007 before she began regular treatment for substance abuse and mental health issues.

cc:    Karl Osterhout, Esquire
       1789 Braddock Avenue
       Suite 570
       Pittsburgh, PA 15218

       Jessica Lieber Smolar
       Assistant United States Attorney